IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-919

Filed 3 June 2026

Henderson County, No. 23CVS000288-440

KIRK A. HALL and KONNIE F. HALL, INDIVIDUALLY, and as CO-TRUSTEES OF THE KIRK A. HALL and KONNIE F. HALL JOINT LIVING TRUST DATED MARCH 6, 2015, KIRK A. HALL TRUSTEE OF THE KIRK A. HALL and KONNIE F. HALL JOINT LIVING TRUST, DATED MARCH 6, 2015, HANNAH HALL, LUCINDA A. HEMENWAY, and NANCY ALLISON HULL, Petitioners,

v.

HENDERSON COUNTY and FIRST CONTACT MINISTRIES, INC., Respondents.

Appeal by Respondents from Orders entered 27 February 2024 and 24 April 2024 by Judge Steve Warren in Henderson County Superior Court. Heard in the Court of Appeals 22 September 2025.

*Van Winkle, Buck, Wall, Starnes and Davis, P.A., by Brian D. Gulden and Jonathan H. Dunlap, for Petitioners-Appellees.*

*Roberts & Stevens, PA, by David Hawisher and John Noor, for Respondent-Appellant First Contact Ministries, Inc.*

HAMPSON, Judge.

**Factual and Procedural Background**

First Contact Ministries, Inc., (Respondent) appeals from an Order of the Superior Court of Henderson County ordering the Henderson County Board of

Adjustment (the Board) to deny Respondent's application for a special use permit.

The Record on Appeal tends to show the following:

In 2022, Respondent applied for a special use permit to operate a residential addiction-recovery facility (the Facility). The Facility would operate on a 27-acre parcel of land in a rural residential zoning district of Henderson County, which includes an existing single-family residential home. Respondent proposed to convert that home for use by ten to sixteen residents, not counting staff. After consulting with County staff, Respondent in its application categorized the Facility as an Assisted Living Residence (ALR), one of the uses recognized by Henderson County's Land Development Code (the Code). The County's Technical Review Committee reviewed the application and voted to forward it to the Board, subject to conditions related to various regulatory requirements. The Board held a hearing regarding the application beginning on 28 September 2022, with additional sessions on 26 October, 21 November, 14 December, and 25 January 2023.

The individual Petitioners—Kirk Hall, Konnie Hall, Hannah Hall, Lucinda Hemenway, and Nancy Hull (collectively, Petitioners)—each own property adjoining the Facility parcel. At the first session, the Board hearing was continued by agreement of the parties to allow Petitioners to retain expert witnesses. Formal testimony was presented during the next three sessions.

During those sessions, Petitioners testified to their concerns regarding the Facility, including the possibility of trespass and other behavior by the residents,

some of whom would have criminal convictions. Petitioners also proffered expert witnesses. Mark Teague was certified as an expert in traffic engineering. When asked whether the Facility would have a material adverse effect on public health, safety, and welfare as regarding traffic concerns, Respondent objected because Mr. Teague had not created the traffic report upon which his testimony relied. The Board excluded the portions of his testimony Respondent objected to. Benny Waller is a real estate appraiser. Respondent objected to Mr. Waller's certification as an expert in real estate appraisal because his analysis was not applied specifically to the impact of the Facility on nearby properties but was general in nature. The Board declined to certify Mr. Waller as an expert.

Respondent proffered Lynn Carmichael as an expert appraiser, and she testified regarding the impact of the Facility on the value of nearby properties. Petitioners objected to her testimony, arguing it was based on insufficient data. The Board allowed Ms. Carmichael to testify over Petitioners' objection.

Following the hearings, the Board granted Respondents' application for special use permit subject to certain conditions including Respondent's agreement to enforce an occupancy limit, drive to Hendersonville any participant in the program who wishes to leave, and to restrict those with certain types of criminal convictions from residing at the Facility as either staff or participant.

On 16 March 2023, Petitioners filed a Petition for Writ of Certiorari in Henderson County Superior Court (the Petition). Petitioners alleged the Board had

committed numerous errors of law, violated their Constitutional rights, and that its decision was arbitrary and capricious.

The trial court reversed the decision of the Board on three grounds: (1) the permit was improperly issued for an Assisted Living Residence rather than a Mental Health Facility; (2) the Board had erred as a matter of law by excluding testimony of Mr. Teague and Mr. Waller; and (3) the Board had erred as a matter of law by admitting Ms. Carmichael's testimony.

In its first Order, the trial court remanded the case to the Board to process the application for a Mental Health Facility, rather than an ALR. In a subsequent order upon Petitioners' Rule 60(a) Motion it instead instructed the Board to revoke Respondent's special use permit and that any future application must classify the Facility as a Mental Health Facility.

Respondent appeals.

## Issues

The issues on appeal are whether: (I) Petitioners lacked standing to file the Petition; (II) the trial court erred by concluding the Facility should be categorized as a Mental Health Facility rather than an Assisted Living Residence and ordering the Board to deny Respondent's application; (III) the trial court erred by concluding the Board had erred as a matter of law in admitting the testimony of Lynn Carmichael; (IV) the trial court erred by concluding the Board had erred as a matter of law in excluding the testimony of Benny Waller and Mark Teague; and (V) the Petition must

be dismissed for violating the Fair Housing Act.

## Analysis

A local government board, when determining whether to grant or deny a special use permit, sits as a quasi-judicial body. *Humble Oil & Refining Co. v. Bd. of Aldermen,* 284 N.C. 458, 469, 202 S.E.2d 129, 136-37 (1974). The board determines whether an "applicant has produced competent, material, and substantial evidence tending to establish the existence of the facts and conditions which the ordinance requires for the issuance of the requested permit[.]" *Id.* at 468, 202 S.E.2d at 136. If the applicant satisfies this burden of production, it makes a prima facie case that the permit should be issued, and the Board must grant the application unless it makes contrary findings which are likewise supported. *Id.*

Appeals of a local board's quasi-judicial decisions are taken in superior court, by the filing of a petition for certiorari. *Schooldev East, LLC v. Town of Wake Forest*, 386 N.C. 775, 784, 909 S.E.2d 181, 189 (2024); N.C. Gen. Stat. § 160D-1402(b) (2025). When reviewing these decisions, "the superior court does not function as a trial court; rather, it sits in the posture of an appellate court and reviews the evidence presented to the local government board." *Id.* (cleaned up). The scope of that review is specified by statute:

> (1) When reviewing the decision under the provisions of this section, the court shall ensure the rights of petitioners have not been prejudiced because the decision-making body's findings, inferences, conclusions, or decisions were:

    a. In violation of constitutional provisions, including those protecting procedural due process rights.

    b. In excess of statutory authority conferred upon the local government, including preemption, or the authority conferred upon the decision-making board by ordinance.

    c. Inconsistent with applicable procedures specified by statute or ordinance.

    d. Affected by other error of law.

    e. Unsupported by competent, material, and substantial evidence in view of the entire record.

    f. Arbitrary or capricious.

N.C. Gen. Stat. § 160D-1402(j)(1).

The standard of review applied by the superior court depends on the issues raised by the petitioner. *PHG Asheville, LLC v. City of Asheville,* 374 N.C. 133, 150, 839 S.E.2d 755, 766 (2020). Alleged errors of law are reviewed *de novo. Id.* If the petitioner alleges the board's decision "was unsupported by competent, material, and substantial evidence or was arbitrary or capricious, the court undertakes a whole record review." *Schooldev East,* 386 N.C. at 785, 909 S.E.2d at 189. "In conducting a whole record review, the superior court must examine all competent evidence (the 'whole record') in order to determine whether the board's decision is supported by substantial evidence." *Id.*

"In an appeal from the judgment of the superior court, the Court of Appeals examines the superior court's order for errors of law by (1) determining whether the

superior court exercised the appropriate scope of review and, if so, (2) deciding whether the superior court did so properly." *Durham Green Flea Mkt. v. City of Durham*, 388 N.C. 543, 548, 923 S.E.2d 524, 528 (2025). We review the decision of the Board without deferring to the ruling of the trial court: this Court reviews the Board's actions, not that of the Superior Court. *Turik v. Town of Surf City*, 182 N.C. App. 427, 431, 642 S.E.2d 251, 253 (2007).

I.   <u>Standing</u>

As a threshold matter, Respondent argues Petitioners do not have standing to challenge the Board's decision. We disagree, as each Petitioner has shown special damages.

The quasi-judicial decisions of local government boards may be appealed by filing a petition for writ of certiorari with the superior court. N.C. Gen. Stat. § 160D-1402(b). Only those with standing to challenge the decision may file a petition, and our statutes enumerate the categories of persons who have standing. *Id.* § 160D-1402(c). Most relevant to this case, any person "who will suffer special damages as the result of the decision being appealed" has standing to file a petition. *Id.* § 160D-1402(c)(2).

Special damages are damages "distinct from the rest of the community," which must be alleged in the petition. *Casper v. Chatham Cnty.*, 186 N.C. App. 456, 458, 651 S.E.2d 299, 301 (2007). The petitioner must allege "the facts on which the claim of aggrievement is based." *Kentallen, Inc. v. Hillsborough*, 110 NC. App. 767, 769, 431

S.E.2d 231, 232 (1993). A reduction in property value does not on its own constitute special damages, though it may be part of the basis for standing. *Cherry v. Wiesner,* 245 N.C. App. 339, 347, 781 S.E.2d 871, 877 (2016). Likewise, the fact that a petitioner "owns property 'immediately adjacent or in close proximity to the subject property' also bears some weight on the issue of whether the party will suffer damages, but status as an adjacent landowner alone is insufficient to confer standing." *Id.* at 349, 781 S.E.2d at 878 (citing *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008)). The petitioner must allege "the manner in which the value or enjoyment of [their] land has been or will be adversely affected," and the harm alleged must be distinct from the community at large. *Kentallen,* 110 N.C. App. at 769, 431 S.E.2d at 232.

For example, allegations that rezoning ordinances would diminish the value of a petitioner's property by increasing traffic and demands on public utilities are insufficient to show special damages distinct from the rest of the community. *See Davis v. City of Archdale,* 81 N.C. App. 505, 508, 344 S.E.2d 369, 371 (1986). But allegations that construction of an adult establishment would cause "vandalism, safety concerns, trespass, and parking overflow from the proposed business to adjacent or nearby lots" owned by the parties were sufficient to confer standing. *Mangum,* 362 N.C. at 645, 669 S.E.2d at 284.

Here, each Petitioner owns property adjacent to the Facility. Lucinda Hemenway and Nancy Allison Hull alleged they would be distinctly affected based on

8

increased traffic on the common access road they share with the Facility. Ms. Hull additionally alleged concerns about noise and flooding resulting from a woodshop Respondent plans to construct as part of the Facility. She also raised privacy concerns common to all adjacent landowners resulting from Respondents' installation of outdoor security cameras on the property. These concerns are unique to owners of property adjacent to the Facility and are therefore sufficiently distinct from the rest of the community to confer standing. *See, e.g., Murdock v. Chatham Cty.,* 198 N.C. App. 309, 317, 679 S.E.2d 850, 856 (2009) (impact to nearby properties of building lights, noise, and runoff sufficiently distinct from rest of community to confer standing).[1]

II.    Use Category

The trial court ruled the Board had erred in processing and considering Respondent's application based upon the designation of the Facility as an "Assisted Living Residence." It instructed the Board to revoke Respondent's special use permit and ordered that any future application must classify the Facility as a Mental Health Facility. Respondent argues the Facility is properly classified as an ALR.

Petitioners argue the Facility should have been categorized as a Mental Health

---

[1] Petitioners have also alleged special damages based on risks resulting from the character of residents of the Facility. Respondents argue these concerns are an impermissible basis for standing as they discriminate against persons recovering from addiction, in violation of the Federal and State Fair Housing Acts. Because the other special damages alleged by Petitioners are sufficient to confer standing, we do not reach this issue.

Facility to better match the specific use proposed by Respondent and that the application's categorization of the Facility as an ALR did not raise the required issues before the Board or provide interested parties with sufficient notice of the purpose of the Facility. In support of their argument, Petitioners rely on our decision in *Freewood Assocs., Ltd. v. Davie Cnty. Zoning Bd. of Adjustment,* 28 N.C. App. 717, 222 S.E.2d 910 (1976). In that case, we affirmed the zoning board's denial of a conditional use permit for a "private family campground" when the applicant actually planned to operate a nudist camp. 28 N.C. App at 721, 222 S.E.2d at 913. The applicant in that case omitted the true intended use from the application and concealed it from the public until a representative of the applicant was cross-examined at a public hearing. *Id.* at 720, 222 S.E.2d at 912.

We noted the use of a property should be stated truthfully and accurately in a permit application:

> Broadly, the purpose of a zoning is to limit the use of land in the interest of public welfare. It is based on the exercise of police power, and generally may be exercised only after adequate public notice and hearing, and this notice should correctly inform the public and the Board of Adjustment of the use that the applicant proposes to make of the premises.

28 N.C. App. at 720, 222 S.E.2d at 912. We concluded "the designated use was so inaccurate, and the variance in the designated use and the intended use so substantial, that the Board of Adjustment could not lawfully grant either a conditional use or nonconforming use permit for use of the premises as a family

campground." *Id.* at 721, 222 S.E.2d at 913.

A. *Board's Interpretation of Code Provisions*

This case is distinguishable from *Freewood*, primarily because in that case we deferred to the local board's interpretation of its local ordinance and affirmed its decision. Here, Petitioners ask us to *reverse* the decision of the Board and determine the Facility should have been categorized as an ALR, thereby substituting our interpretation of the local ordinance for the Board's.

Interpretation of a local ordinance presents a question of law. *Ayers v. Bd. of Adjustment for Town of Robersonville,* 113 N.C. App. 528, 531, 439 S.E.2d 199, 201 (1994). We review such questions de novo, considering the matter anew. *In re Appeal of Willis*, 129 N.C. App. 499, 501, 500 S.E.2d 723, 725 (1998). However, we do not substitute our judgment for that of the Board, but determine whether the Board's interpretation of the ordinance is reasonable:

> [O]ne of the functions of a Board of Adjustment is to interpret local zoning ordinances, and [the Board's] interpretation of its own ordinance is given deference. Therefore, our task on appeal is not to decide whether another interpretation of the ordinance might reasonably have been reached by the Board, but to decide if the Board acted arbitrarily, oppressively, manifestly abused its authority, or committed an error of law in interpreting the ordinance.

*Whiteco Outdoor Advert. v. Johnston Cnty. Bd. of Adjustment,* 132 N.C. App. 465, 470, 513 S.E.2d 70, 74 (1999) (cleaned up).

Prior to submitting its application, Respondent consulted with the Henderson

County Zoning Administrator, as directed by the Code. Henderson Cnty. Code Ord. § 42-355(C). The Zoning Administrator, among other duties, is tasked with determining the meaning of Code provisions. *Id.* § 42-308. He testified to the Board that the only option available to Respondents was to categorize the Facility as an ALR—that Mental Health Facility is a subcategory of ALR but not a *use* recognized by the Code, so the application was properly made for an ALR. Accordingly, he advised Respondent to categorize the Facility on its application as an ALR. The Board, by granting the special use permit, indicated it concluded this categorization was proper.

Because the text of the Code designates ALR as an enumerated use but does not do the same for Mental Health Facility, we cannot say the Board's interpretation is a "manifest error of law." *Whiteco,* 132 N.C. App. at 470, 513 S.E.2d at 74. The Code contains a "Table of Permitted and Special Uses" which lists all "uses which may be permitted in one or more of the various zoning districts established by [the Code]." Henderson Code §§ 42-61, 42-26. This table enumerates the permissible uses, divided by category, with indication for each use whether that use is permitted by right or requires a special use permit in each of the various zoning districts. For instance, an Assisted Living Residence requires only a zoning permit to operate in any of the five commercial zoning districts, but a special use permit in the five residential zoning districts:

Subpart D. Table of Permitted and Special Uses
§42-61.        **Table of Permitted and Special Uses**

| USE TYPE | GENERAL USE DISTRICT P=Permitted; S=*Special Use Permit* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | R1 | R2 | R2R | R3 | R4 | OI | LC | CC | RC | I | SR |
| **1. RESIDENTIAL USES** | | | | | | | | | | | |
| *Assisted Living Residence* | S | S | S | S | S | P | P | P | P |  | 1.1 |
| *Bed and Breakfast Inn* | P | P | P | P | P | P | P |  |  |  | 1.2 |
| *Continuing Care Retirement Community* | S | S | S | S | S | P | P | P | P |  | 1.3 |
| *Dwelling, Manufactured Home (multi-section)* | P | P | P | P | P |  | P |  |  |  | 1.4 |
| *Dwelling, Manufactured Home (singlewide)* |  |  | P | P | P |  |  |  |  |  | 1.4 |
| *Dwelling, Mobile Home* |  |  | P | P | P |  |  |  |  |  | 1.4 |
| *Dwelling, Multifamily* | S | S | S |  |  | S | S | S |  |  | 1.5 |
| *Dwelling, Single Family Detached* | P | P | P | P | P |  | P |  |  |  | 1.6 |
| *Dwelling, Two Family Attached* | P | P | P | P | P | P | P |  |  |  | 1.7 |
| *Family Care Home* | P | P | P | P | P | P | P |  |  |  | 1.8 |
| *Fraternity and/or Sorority House* | P |  |  |  |  | P |  |  |  |  | 1.9 |
| *Hospice Residential Care Facility* | S | S | S | S | S | P | P | P |  |  | 1.10 |
| *Manufactured Home Park* |  |  | S | S | S |  |  |  |  |  | 1.11 |
| *Nursing Home* | S | S | S | S | S | P | P | P | P |  | 1.12 |
| Personal Storage Structures | P | P | P | P | P | P | P | P | P | P | 1.13 |
| *Rooming and Boardinghouse* | S | S | S | S | S |  | P | P |  |  | 1.14 |

The table also indicates whether there are additional "Supplemental Requirements" the use must comply with, which "represent the minimum conditions for issuance of a Zoning Permit or a Special Use Permit." Henderson Code § 42-26. The Code lists the supplemental requirements for each individual use in the section immediately following the Table. An ALR, for instance, must have a site plan, meet certain lighting and road accessibility standards, must be certified in accordance with State law, and provide a method of solid waste disposal. *Id* § 42.62 SR 1.1.

Mental Health Facility does not appear as a use on the Table of Permitted and Special Uses and has no entry in the section of the Code detailing the supplemental requirements for each use. In fact, the term "Mental Health Facility" does not appear anywhere in the Code outside of Article XIV, the "Definitions" portion of the Code.

13

ALR, by contrast, is both listed on the Table of Permitted and Special Uses and has an individual entry in the list of supplemental requirements.

The Code's Article XIV definitions for each of these terms shed light on this distinction. ALR and Mental Health Facility are defined both as individual terms and as two of the eight subcategories of "Extended Care Facilities." § 42-391. An Extended Care Facility is defined as: "A licensed care facility that provides continuing services to residents and which shall include: family care homes, hospice residential care facilities, *assisted living residences*, adult care homes, *mental health facilities*, multiunit assisted housing with services, nursing homes, and continuing care retirement communities." *Id.* (emphasis added).

"Extended Care Facility" is not enumerated in the Code's Table of Permitted and Special Uses. However, three of its eight subcategories are: Assisted Living Residence, Hospice Residential Care Facility, and Nursing Home are each listed as individual use types for which a permit or SUP may be obtained. The other five subcategories, including Mental Health Facility, are not. The definition of ALR as a subcategory of Extended Care Facility clarifies this, stating: "Extended care facilities with seven (7) or more residents (excluding *hospice residential care facilities* and *nursing homes*) shall, for the purposes of this Chapter, be included with and permitted in the same fashion as an assisted living residence[.]" *Id.* Thus, under the text of the Code, Hospice Residential Care Facilities and Nursing Homes are permitted as independent categories, and accordingly, like ALR, have individual

entries both in the Table of Permitted and Special Uses and the list of supplemental requirements. All other types of Extended Care Facility, including Mental Health Facilities, do not have individual entries in the table and are properly permitted as ALRs. Therefore, under the text of the statute, the Board's determination the Facility was properly categorized as an ALR was reasonable.

One reason we affirmed the local board's decision in *Freewood* was because a nudist camp was so distinct from a family campground "the inadequate and improper designation in the application of the proposed use of the premises does not properly raise the issues before the Board." 28 N.C. App. at 721, 222 S.E.2d at 913. Petitioners argue the same is true for ALR and Mental Health Facility. We disagree.

Where we treated family campgrounds and the proposed nudist campground in *Freewood* as separate and distinct categories of use, ALR and Mental Health Facility under the Code are both subcategories of Extended Care Facility—"a licensed care facility that provides continuing services to residents." Henderson Code § 42-391. An ALR is a facility for seven or more persons which provides housekeeping services, personal care services, and at least one meal per day. *Id.* A Mental Health Facility "provides services to individuals who are mentally ill, developmentally disabled, or substance abusers." *Id.* Neither of these definitions exclude the other, and we cannot say the Board was unreasonable in determining an application for ALR sufficiently raised the necessary issues. Additionally, we noted in *Freewood* a specific issue which was not raised by the application: it was unclear whether a nudist

15

camp was even legal under our General Statutes, and because a permit may only be granted for a lawful use an application for a family campground did not raise the necessary issue of legality. *Id.* at 720, 222 S.E.2d at 913. Petitioners in this case do not similarly identify any relevant issue which was not raised before the Board.

Because the text of the statute supports the Board's interpretation and Respondent's application properly raised the relevant issues the Board, by categorizing the Facility as an ALR, did not act "arbitrarily, oppressively, manifestly abuse its authority, or commit[] an error of law" in interpreting the Code. *Whiteco,* 132 N.C. App. at 470, 513 S.E.2d at 74. Thus, as in *Freewood*, we defer to the Board's reasonable interpretation of its local ordinance. *Id.*

## B. Due Process

Petitioners additionally argue the categorization as an ALR was misleading for the purposes of providing notice to the public, implicating due process concerns. Notice prior to a public hearing "should correctly inform the public and the Board of Adjustment of the use that the applicant proposes to make of the premises." *Freewood,* 28 N.C. App. at 720, 222 S.E.2d at 912. Given that the Facility is properly categorized as an ALR, Respondent's categorizing it as such on its application does not appear to be misleading. Even assuming this categorization was misleading as to the intended use such that the application did not provide sufficient notice, Petitioners in this case do not allege they were prejudiced by a lack of notice, and we can find no indication of prejudice in the Record. Our review of a local board's

proceedings is limited to ensuring the rights of the petitioners have not been prejudiced. *See* N.C. Gen. Stat. § 160D-1402(j) ("When reviewing the decision under the provisions of this section, the court shall ensure that the rights of petitioners have not been prejudiced . . ."). Respondent distributed informational materials to community members prior to the hearing, which included an invitation to meet with a representative of Respondent. The first hearing was held on 28 September 2022, at which time Petitioners requested a continuance in order to investigate the application and retain expert witnesses. The hearing was continued to 26 October, and testimony was heard in monthly sessions in October, November, and December. The testimony does not indicate that Petitioners, the Board, or any other interested parties were unaware of the intended use of the Facility for Respondent's addiction-recovery program. In *Freewood,* by contrast, the applicant took deliberate steps to conceal the actual character of the intended use: there was evidence the owner "had taken every possible precaution to avoid any publicity or to be identified as a nudist camp and had falsely denied to a local news reporter that he intended to operate a nudist camp." 28 N.C. App. at 718, 222 S.E.2d at 911. The intended use was "deliberately concealed from the public and was not disclosed to the Board of Adjustment until elicited by cross-examination." *Id.* at 720, 222 S.E.2d at 912. There is no evidence of such concealment in this case or of prejudice to Petitioners due to the Facility being characterized as an ALR on Respondent's application.

*C. Definition of Assisted Living Residence*

17

Petitioners finally argue the Facility cannot be categorized as an ALR because no evidence was provided that it would provide housekeeping or personal care services, which are included in the Code's definition of ALR. Henderson Code § 42-391. But this is not a showing required of Respondent. When determining if it should grant a special use permit, the Board must find that the specific site standards for the use, as regulated by the Code, have been met. *Id.* § 42-255 H. The applicant does not bear the burden of proof for general considerations such as impact on the value of nearby property, but it may be required to rebut evidence showing these standards would not be met. *Id; see also Woodhouse v. Bd. of Com'rs of Town of Nags Head,* 299 N.C. 211, 219, 261 S.E.2d 882, 887 (1980).

If the applicant makes the required showing, the Board issues a special use permit. *Id.* Respondent was not required to affirmatively show the intended use fits the definition of ALR: the special use permit *allows* Respondent to use the Facility as an ALR. If, following the issuance of the special use permit, Respondent put the property to a prohibited use, Respondent would then be in violation of the Code. Henderson Code § 42-8. Failing to affirmatively establish during the application process that each aspect of the definition of ALR is met—a duty not imposed on applicants by the Code—does not render the "designated use so inaccurate, and the variance in the designated use and the intended use so substantial" that the Board could not properly address the issues raised by the intended use. *Freewood,* 28 N.C.

App. at 721, 222 S.E.2d at 913.[2]

III.    Admission of Expert Testimony

The trial court concluded the Board erred as a matter of law in allowing Lynn Carmichael to testify regarding the impact of the Facility on the value of surrounding property. Ms. Carmichael, a licensed appraiser, was qualified as an expert witness with no objection by Petitioners. She testified that she had performed a market impact study on properties surrounding four recovery centers in Western North Carolina. Her study examined sales data for residential properties within a one-mile radius, five-mile radius, and within the zip code of each recovery center from 2015 through 2022. She concluded the recovery centers had no impact on the sales volume or appreciation in value of properties closer to the centers, and that the Facility would likewise have "no injurious impact on value."

Petitioners objected to Ms. Carmichael's testimony during the hearing and argue her testimony should have been excluded as irrelevant because it was based on inadequate data. *See State v. Crumbley*, 135 N.C. App. 59, 65, 519 S.E.2d 94, 98 (1999)

---

[2] We note as well that so strict a reading of the definitions of individual permitted and special uses could render uses which vary slightly from those definitions permissible without a zoning or special use permit. "Zoning regulation is in derogation of common law property rights and therefore must be strictly construed to limit such derogation to that intended by the regulation." *Coleman v. Town of Hillsborough,* 173 N.C. App. 560, 564, 619 S.E.2d 555, 559 (2005). Accordingly, uses which are unregulated by the ordinance do not require a permit, and blanket proscriptions on unenumerated uses are unenforceable. *See Land v. Village of Wesley Chapel,* 206 N.C. App. 123, 697 S.E.2d 458 (2010) (private shooting range did not fit into any land-use category of ordinance and therefore did not require special use permit). The Board, instead, interpreted the Code to understand the intended use of the Facility as an ALR, which requires a special use permit.

("Rule 702 does not, however, allow opinion testimony based on inadequate data."). They argued her study should have accounted for when the recovery centers opened, should have specifically examined the impact on adjacent properties, and that the licensed recovery centers in her study were not adequately similar to the Facility. The trial court determined the Board had erred as a matter of law in admitting Ms. Carmichael's testimony "without knowing when the considered recovery center facilities were started business (sic) or opened so as to conduct an analysis of impact over a certain period of time." It initially remanded the case to allow the Board to receive evidence as to when the comparable facilities first started operation.[3]

In reviewing the appeal of the Board's decision we first determine whether the trial court exercised the appropriate scope of review, then decide whether the trial court did so properly. *Durham Green Flea Market,* 388 N.C. at 548, 923 S.E.2d at 528. The scope of that review is provided by statute. The trial court is instructed to:

> ensure the rights of petitioners have not been prejudiced because the decision-making body's findings, inferences, conclusions, or decisions were:
>
> a. In violation of constitutional provisions, including those protecting procedural due process rights.
>
> b. In excess of statutory authority conferred upon the local government, including preemption, or the authority conferred upon the decision-

---

[3] However, the trial court revised its ruling to require the Board to deny the permit rather than conduct a new hearing.

   c.  Inconsistent with applicable procedures specified
       by statute or ordinance.

   d.  Affected by other error of law.

   e.  Unsupported by competent, material, and
       substantial evidence in view of the entire record.

   f.  Arbitrary or capricious

N.C. Gen. Stat. § 160D-1402(j)(1)

Here, the trial court found the Board had erred "as a matter of law" in admitting Ms. Carmichael's testimony without information regarding when the comparable facilities began operation. The trial court thus appears to have reviewed the evidentiary issues in this case to determine if they were "affected by other error of law." However, Board proceedings are quasi-judicial in nature, and the Board is not bound by the Rules of Evidence but may consider all of the evidence offered. *Humble Oil*, 284 N.C. at 470, 202 S.E.2d at 137. As the Board is not bound by the Rules of Evidence, it is unclear what error of law it could have committed by admitting the testimony.

Instead, when reviewing the admission of evidence at a hearing of a local board, that review is generally based on our responsibility to ensure the rights of the petitioners have not been prejudiced because the findings, inferences, conclusions, or decisions were "unsupported by competent, material, and substantive evidence in view of the entire record." N.C. Gen. Stat. § 160D-1402(j)(1)e. *See, e.g., Harding v. Bd.*

*of Adjustment of Davie Cnty.*, 170 N.C. App. 392, 397-98, 612 S.E.2d 431, 436 (2005) (reviewing admission of expert testimony to determine if board's decision was supported by competent evidence). Competent evidence can include evidence which would be inadmissible in a trial court under our Rules of Evidence if that evidence falls into one of two categories:

> The term "competent evidence", as used in this subsection, does not preclude reliance by the decision-making board on evidence that would not be admissible under the rules of evidence as applied in the trial division of the General Court of Justice if (i) . . . the evidence was admitted without objection or (ii) the evidence appears to be sufficiently trustworthy and was admitted under such circumstances that it was reasonable for the decision-making board to rely upon it.

N.C. Gen. Stat. § 160D-1402(j)(3).

In this case, Petitioners objected to Ms. Carmichael's testimony, so we address whether the evidence appears to be sufficiently trustworthy and was admitted under such circumstances that it was reasonable for the Board to rely upon it. We note that although the "technical legal rules of evidence and procedure may be disregarded, no essential element of a fair trial can be dispensed with. The party whose rights are being determined must be given the opportunity to cross-examine witnesses, inspect documents and offer evidence in explanation and rebuttal." *Jarrell v. Bd. of Adjustment for City of High Point*, 258 N.C. 476, 481, 128 S.E.2d 879, 883 (1963). Ms. Carmichael explained her methodology in detail, specifically describing the data that she used and the conclusions she reached as a result. Petitioners had the opportunity

to cross-examine her and did so thoroughly, highlighting information her methodology did not take into account. The limitations of the methodology were clearly set out, and the Board was given information allowing it to determine the appropriate weight to give the evidence. Even assuming this evidence was inadmissible as expert testimony under our Rules of Evidence, it "appears to be sufficiently trustworthy and was admitted under such circumstances that it was reasonable for the [Board] to rely upon it." N.C. Gen. Stat. § 160D-1402(j)(3).

Even if Ms. Carmichael's testimony were not competent evidence, it does not appear the Board relied on it in granting the special use permit. Although the Board found as a fact that, with the conditions imposed in its Order "the Applicant's proposed use would not substantially injure the value of property or improvements in the area," Respondent had no burden to produce evidence related to the impact of the Facility on the value of surrounding property. An applicant for a special use permit "bears the initial burden of showing compliance with the standards and conditions required by the ordinance for the issuance of a conditional use permit." *Woodhouse,* 299 N.C. at 217, 261 S.E.2d at 887. For general considerations, however, opponents of the application bear the initial burden of showing the proposed use would have a negative impact. *Id.* at 219, 261 S.E.2d at 887-88 ("To hold that an applicant must first anticipate and then prove or disprove each and every general consideration would impose an intolerable, if not impossible, burden on an applicant for a conditional use permit."). The Henderson Code is consistent with this:

> The *applicant* will not bear the burden of proving that all of the site standards (as listed below) have been met; however the *applicant* will be required to produce evidence sufficient to rebut any evidence presented that the site standards would not be met or that a condition is necessary. The *applicant* may be required, in his/her rebuttal, to show that the proposed *use* will:
>
> a. Not materially endanger the public health, safety or welfare;
>
> b. Not substantially injure the value of property or improvements in the area; and
>
> c. Be in harmony with the surrounding area.

Henderson Code § 42-355(H)(1). Petitioners did not present any evidence tending to show the Facility would have a negative impact on the value of surrounding residential property. Accordingly, Respondent was not required to produce rebuttal evidence and the Board thus did not rely on Ms. Carmichael's testimony in making its decision.

IV.  Exclusion of Expert Testimony

The Board excluded the testimony of two witnesses Petitioners called as experts: Mark Teague, a traffic engineer, and Benny Waller, a property value appraiser. As with the Board's admission of Ms. Carmichael's testimony, the trial court concluded in its Order that the Board "erred as a matter of law" in excluding the testimony of these witnesses.

As discussed above, the Board, as a quasi-judicial body, is not bound by the Rules of Evidence, and its evidentiary rulings at odds with those rules are not "errors

of law" as such. And while review of the *admission* of evidence is enabled by our charge to ensure the decision of the Board was supported by "competent, material, and substantial evidence in view of the entire record," N.C. Gen. Stat. § 160D-1402(j)(1)e, evidence alleged to have been *excluded* erroneously does not raise a similar concern. Instead, our review of a local board's exclusion of evidence stems from the statutory instruction to ensure petitioners were not prejudiced by a decision made "in violation of constitutional provisions, including those protecting procedural due process rights." N.C. Gen. Stat. § 160D-1402(j)(1)(a). *See, e.g., Davidson Cnty. Broad. Co. Inc. v. Iredell County,* 248 N.C. App. 305, 790 S.E.2d 663 (2016) (determining if exclusion of expert testimony as to issue of harmony with surrounding area violated petitioners' right to due process). Although the Board is not bound by formal rules of evidence or civil procedure, its procedures "can dispense with no essential element of a fair trial." *In re Application of Raynor,* 94 N.C. App. 173, 176, 379 S.E.2d 884, 886 (1989). One essential element of a fair trial is that a "party whose rights are being determined [is entitled to] offer evidence in support of his position and in rebuttal of his opponents' contentions." *Id.* at 177, 379 S.E.2d at 887. Thus, the Board's exclusion of evidence is properly reviewed to determine whether that exclusion violated Petitioners' right to due process.

Petitioners have made no argument and provided no authority relating to due process concerns raised by this exclusion. Their arguments are instead based in our

Rules of Evidence, which do not govern the Board's proceedings.[4] We do not now determine whether Petitioners' due process rights were violated by the exclusion of testimony because it is not the role of this Court to "supplement an appellant's brief with legal authority or arguments not contained therein." *K2HN Construction NC, LLC v. Five D Contractors, Inc.,* 267 N.C. App. 207, 215, 832 S.E.2d 559, 565 (2019). Likewise, the trial court did not address whether the Board violated Petitioners' due process rights, and it therefore erred in determining the Board "erred as a matter of law" by excluding their expert witnesses.

V.    Fair Housing Act

Respondent additionally argues Petitioners' opposition to its application violates the Fair Housing Act (FHA) in that the Petition commences litigation which has an illegal objective. As Respondent concedes, this is a matter of first impression. The FHA creates a cause of action when a person is denied housing because of their handicap, and it can be asserted as a defense in certain proceedings that would deprive the defendant of housing, particularly ejectment actions. *See, e.g., United States v. Wagner,* 940 F.Supp. 972, 980 (N.D. Tex. 1996); *Newell v. Rolling Hills Apartments,* 134 F.Supp.2d 1026, 1038 (N.D. Iowa 2001). Former and recovering

---

[4] The Petition alleges the Board "committed errors of law by prejudicing Petitioners' procedural due process rights when it held their witnesses, includ[ing] expert witnesses, to a standard not required by the rules of evidence and denied Petitioners the right to offer evidence through those expert witnesses." In their arguments to this Court, however, Petitioners neither raise due process concerns nor identify legal standards by which we may determine whether their right to due process has been violated.

addicts are considered to have a handicap and may not be discriminated against on that basis. *U.S. v. Southern Management Corp.,* 955 F.2d 914, 922 (4th Cir. 1992). The FHA has not previously been applied and interpreted to require dismissal of a petition appealing a zoning permit decision based on alleged discriminatory animus of the petitioners.

In this case, no person has been denied housing because we reverse the decision of the trial court ordering the Board to rescind Respondent's special use permit. We therefore do not reach the FHA issue raised by Respondent.

## Conclusion

For the foregoing reasons, we hold the trial court erred in: (1) ordering the Board to deny Respondent's application for special use permit; (2) concluding the Board had erred in excluding the testimony of Petitioners' expert witnesses; and (3) concluding the Board had erred in admitting the testimony of Lynn Carmichael. We reverse the Order of the trial court.

REVERSED.

Judges ZACHARY concurs.

Judge MURRY concurs in part and dissents in part by separate opinion.

MURRY, Judge, concurring in part, dissenting in part.

I agree with the majority that Petitioners have adequate standing to bring their claims and that the FHA does not apply in this case. However, I disagree that the trial court erred by ordering the Board to deny Respondent's special-use permit application and with reversing their decision to admit the testimony of traffic engineer Mark Teague. I write separately to dissent solely on these evidentiary issues.

The majority's determination that the trial court erred by denying Respondents' application misinterprets the Code, which provides that a special-use permit applicant "will not bear the burden of proving that all of the site standards . . . have been met." Henderson Code § 42-355. While the applicant does not bear the burden of proving that they have met these general considerations, there are *specific* requirements that the applicant must prove by substantial evidence for the Board to determine whether a site will qualify as an ALR or Mental Health facility. *Id.* § 42-391; *see Humble Oil & Refining Co. v. Bd. of Alderman of Town of Chapel Hill*, 284 N.C. 458, 468 (1974) (italics added) ("When an applicant has produced competent, material, and substantial evidence . . . of the facts and conditions which the ordinance requires for the issuance of a special use permit, [*p*]*rima facie* he is entitled to it."). Without this showing, we cannot determine whether "substantial evidence" supports the Board's decision under the whole-record test. *Mann Media, Inc. v. Randolph Cnty. Planning Bd.*, 356 N.C. 1, 13–14 (2002) (quotations omitted). In the present case,

Respondents must prove that their facility meets the statutory requirement of personal care services and at least one meal per day for the Board to determine whether the facility qualifies as an ALR. *See id.* I would remand to the Board for the limited purpose of allowing Respondent to present evidence of planned compliance with the regulatory requirements.

Regarding the exclusion of Mr. Teague's testimony, I agree with the majority that the proper standard of review to apply is whether the exclusion violated Petitioners' procedural due process rights under the United States Constitution. N.C.G.S. § 160D-1402(j)(1)(a); U.S. Const. amend. XIV, § 1. However, I disagree that with the decision to reverse the ruling of the trial court. Instead, the proper remedy for the trial court's error is to remand the case for reconsideration of Mr. Teague's testimony in a manner consistent with the proper standard. *See, e.g.*, *Edgecomb County Dept. of Social Services v. Hickman*, 211 N.C. App. 176, 182 (2011) ("As the trial court failed to apply the correct standard of review, we vacate the order and remand . . . .") The Rules of Evidence may assist in quasi-judicial proceedings as "a guideline to reliability and relevance," even where they are not binding or strictly applied. *State v. Davis*, 353 N.C. 1, 18 (2000). Applying the due process standard, the trial court should determine whether the Board misapplied the Rules, even if applied broadly, by excluding Mr. Teague's testimony for non-authorship of the traffic report that formed the basis of his conclusions. The Rules of Evidence do not require a

*Murry, J., concurring in part, dissenting in part*

testifying expert to prepare the supporting data himself but only that such data consist "of a type reasonably relied upon by experts in the particular field." N.C. R. Evid. 703. Originally, the trial court mistakenly ruled that this misapplication was an error of law upon "view of the entire record." N.C.G.S. § 160D-1402(j)(1)(e). On remand, the trial court should consider whether a violation of the Rules of Evidence occurred, and if so, whether it constitutes a subsequent violation of Petitioners' procedural due process rights.